CITY ELECTRIC, INC., on its own behalf and for behalf of City-Manson-Osberg, a Joint Venture composed of City Electric, Inc., et al., Plaintiffs-Appellees,

v.

LOCAL UNION 77, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Defendant-Appellant.

No. 73–1270.

United States Court of Appeals, Ninth Circuit.

May 28, 1975.
Rehearing Denied July 10, 1975.

Certiorari Denied Oct. 14, 1975.
See 96 S.Ct. 194.

David E. Williams (argued), Richland, Wash., for defendant-appellant.

Bruce M. Cross (argued), Seattle, Wash., for plaintiffs-appellees.

## OPINION

Before LUMBARD,* MERRILL and WRIGHT, Circuit Judges.

MERRILL, Circuit Judge:

This action was brought by appellees to secure a declaratory judgment respecting the effect of an arbitrator's decision.[1] They contended that the decision was binding as to one determination but that as to a second determination it exceeded the arbitrator's authority. Appellant Union contended that the decision should be held binding in its entirety or not at all and that the dispute over the effect of the decision should have been resolved through contractual grievance procedures rather than by the district court. The district court agreed with plaintiffs and granted summary judgment.

Before dealing with the merits of the appeal from judgment a preliminary matter requires attention. After summary judgment was rendered the Union moved for reconsideration, contending for the first time that plaintiffs had waived any right to resort to court action on the dispute by having agreed to abide by the results of arbitration. The motion when made was without factual support. It was not until nearly a month after it had been filed that an affidavit was tendered in support. The district court denied reconsideration. On the basis of this tardily tendered factual dispute, appellants now contend that summary judgment was premature. We disagree. The motion for reconsideration was directed to the court's discretion. We do not regard rejection of the issue so tardily tendered as abuse. We turn to the merits of the dispute.

Appellee City-Manson-Osberg is a joint venture of which appellee City Electric, Inc. ("the Company"), is managing partner. The Company and appellant Union are parties to a collective bargaining contract governing the wages, hours and working conditions of certain of the Company's employees. In the fall of 1971 the joint venture was awarded a contract to perform construction work in connection with Grand Coulee Dam. A portion of this work is within the jurisdiction of the Union and covered by the collective bargaining agreement.

Article V of the collective bargaining agreement governs the designation of "job headquarters" for a particular project. If the location of work being performed under the agreement can properly be designated a "job headquarters," the employer is not required to pay the Union workmen for their travel to and from the job site or their board and room costs. "Job headquarters" is defined as "any location within the area of this Agreement which may be designated by the Contractor as headquarters

* Honorable J. Edward Lumbard, Senior United States Circuit Judge of the Second Circuit, sitting by designation.

1. Jurisdiction was based on § 301 of the National Labor Relations Act as amended, 29 U.S.C. § 185 (1970), and the Declaratory Judgment Act, 28 U.S.C. § 2201 (1970).

for any job. It shall be at a place where accommodations are sufficient within a 5 mile radius from such Job Headquarters to provide suitable board and lodging for all workmen reporting to such Job Headquarters."

Article V establishes the procedure for resolving a dispute as to whether a construction site can qualify as job headquarters. Prior to the start of any job the issue should, if possible, be resolved by conference between the parties. If they are unable to agree, the issue will be submitted to the Labor-Management Committee; and if the members of that committee cannot agree, the matter is to be referred to arbitration. In this case the joint venture calculated its bid for the work on the assumption that Grand Coulee would be a proper job headquarters and that therefore no travel allowance would have to be paid to Union workmen. The Union, at the pre-job conference, did not agree that Grand Coulee qualified as job headquarters. The Labor-Management Committee could not agree and the matter went to arbitration. The arbitrator ruled that the accommodations at Grand Coulee were sufficient to provide suitable board and lodging for a work force of 22 men. He ruled: " * * * that Grand Coulee can be accepted as Job Headquarters for this project to which a total of 22 men shall report." But "[i]f more than 22 men are employed on this project, then the decision rendered is no longer applicable."

■ It is this portion of the decision that plaintiffs-appellees sought to have declared binding. We agree with the district court that this ruling of the arbitrator was binding. See United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

The Union's dispute respecting job headquarters was based upon its experience with other electrical employers engaged in construction projects at Grand Coulee Dam. All (until this employer) had reached pre-job agreements with the Union that employees would receive at least $10 per day travel allowance. This was a compromise figure between the $16 a day allowable by contract if Grand Coulee were determined not to be job headquarters and the zero amount allowable if it were determined to be job headquarters. Plaintiffs here refused to agree to this compromise and the arbitrator took note of the fact that as a result this employer was out of line with the others. The arbitration decision provided:

"It is also the opinion of the arbitrator that, in keeping with common practice and past experience (not 'past practices' or 'established practices') which should have been known by City Manson Osberg at the time of estimating and bidding on this project, the contractor and the union shall seek to negotiate the matter of an additional amount of daily stipend to the workmen employed on this particular project. As the United States Supreme Court pointed out in a 1960 decision, the arbitrator's decision is not limited only to the wording of the contract but must take into consideration 'such factors as the effect upon productivity of a particular result, its consequences to the morale of the shop, his judgment whether tensions will be heightened or diminished.'

While the arbitrator cannot accept—as stated in a previous hearing on Grand Coulee—that $10.00 is an established amount to be paid men who are required to report to Grand Coulee as Job Headquarters, it is his opinion that the fact that men in the same industry, working on similar jobs and under the jurisdiction of the same union as those employed by City Manson Osberg for this project, are receiving an additional sum creates a situation that requires the attention of the parties involved and which demands consideration. This matter is referred to City Manson Osberg and Union 77, I.B.E.W. for negotiation."

It was this portion of the decision that plaintiffs wished the court to declare void and beyond the authority of the

arbitrator. The district court so held. We agree. The arbitrator recognized that the $10 allowance was not pursuant to collective bargaining agreement (or an "established practice"), but was, with the other employers, the subject of an *ad hoc* modification. His ruling was that the parties should "seek to negotiate the matter."

 It is not the function of an arbitrator, under this agreement or traditionally, to decide in what respects the contract in question should be modified in order to bring it into line with agreements of other employers. Contract modifications are not traditionally matters for arbitration. It is the function of the arbitrator to resolve disputes as to what the contract itself provides—as to what the rights of the parties are under the contract then in force—and it is in that connection that note is to be taken of the factors on which the arbitrator here relied in directing the parties to negotiate the amount of a stipend. *See* United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). It is in that connection that we have given broad deference to arbitral decisions based on collective bargaining agreements.[2]

We conclude that the decision of the arbitrator respecting the $10 daily allowance was unauthorized and unenforceable.

The Union contends that, nevertheless, the Company's refusal to negotiate pursuant to the arbitrator's decision furnished the Union with a grievance which properly was processed under the collective bargaining agreement. Section 1.4 of the agreement provides:

"Any grievance which may arise between the Union and the Contractor with respect to the interpretation or application of any terms of this Agreement or with respect to such matters

as the alleged discriminatory or arbitrary treatment of an individual employee arising out of his employment * * * shall be determined by the following procedure."

When the Company refused to comply with the arbitrator's direction to negotiate the rate of travel allowance, Local 77 processed its grievance under this section. The Labor-Management Committee was unable to agree that a grievance under § 1.4 was presented and the dispute was taken to the Council on Industrial Relations for the Electrical Contracting Industry (CIR) which noted that the parties "have not negotiated to conclusion on the issue of a daily stipend," and "suggested" that they continue to negotiate.

 The district court ruled that since this was not a dispute "with respect to the interpretation or application of any terms of this agreement" under § 1.4 the grievance process of the agreement did not apply and the CIR was without jurisdiction to entertain the dispute. We agree. *See* Sinclair Refining Co. v. Atkinson, 370 U.S. 238, 241–43, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). Local 77 contends that the dispute involved the construction of Article V. We cannot agree. As we have noted, it did not involve the agreement as it exists but rather the reaching of an *ad hoc* modification to bring it into line with what had been agreed upon by other employers.

Local 77 contends that jurisdiction of the CIR is not limited to the precise language of the agreement. It points to a provision of the "Standing Council Policies" which Local 77 asserts is binding upon all parties:

"XIII. INTERPRETATION OF EXISTING CLAUSES SUBMITTED FOR ADJUDICATION (Adopted February, 1959)

---

2. *See* United Steelworkers of America v. Amax Aluminum Mill Prods., Inc., 451 F.2d 740, 741–42 (9th Cir. 1971); Holly Sugar Corp. v. Distillery R. W. & A. Workers Union, 412 F.2d 899, 901–02 (9th Cir. 1969); San Francisco-Oakland

Newspaper Guild v. Tribune Pub. Co., 407 F.2d 1327 (9th Cir. 1969); Anaconda Co. v. Great Falls Mill & Smeltermen's Union No. 16, 402 F.2d 749, 750–51 (9th Cir. 1968).

The Council reserves unto itself the right to change or substitute wording, if deemed advisable by the Council, when existing sections of agreements are submitted to the Council for interpretation as to their application or intent."

█ In our judgment this must be construed to apply only to changes to make more clear the application or intent of an existing section in accordance with what is found to be the intent of the contracting parties. It cannot include changes that alter the obligations of the parties. By use of the term "wording" the Council has indicated that it is talking not about changes in the substance of the agreement but rather changes in the manner in which the substance of the agreement has been expressed. Here there is no dispute but that the Company had not agreed to a departure from the terms of Article V. It was the Company's refusal to depart from the terms of the contract that constituted Local 77's "grievance."

Judgment affirmed.